## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, James F. Loomis, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.   I am a Border Patrol Agent (BPA) Intelligence (Intel) with the United States Department of Homeland Security, Office of Border Patrol.  I have been employed as a BPA since August 2011.  I am currently assigned as a Beecher Falls Station Intelligence Agent, and I work at the Beecher Falls Border Patrol Station in Canaan, Vermont.  I received formal training to identify and investigate alien smuggling and narcotics smuggling activities both at the United States Border Patrol Academy in Artesia, New Mexico, from August 2011 to January 2012 and also through regular and recurring on-the-job training and annual Virtual Learning Center course certification.  In my experience of investigating many alien smuggling and narcotics smuggling cases, I know that electronic devices are commonly used to facilitate the smuggling event by arranging the coordination of transportation guiding both the smugglers transporting the narcotics and the receiving load driver via global positioning system applications and verbal and/or non-verbal communications relayed over Wi-Fi and/or a telecommunications network.

2.   Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) and § 846 - Conspiracy to Possess with the Intent to Distribute a Controlled Substance and 8 U.S.C. § 1325 - Illegal Entry have been committed by FERNANDO ALONZO MAYORGA GALVEZ, NESTOR DIMAANO and DENNIS BALAGTAS.  I respectfully submit that there is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

3.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers.  I have not set forth every detail I or other law enforcement agents know about this investigation, but have simply set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested criminal complaint.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.      This affidavit is being submitted in support of an application for a search warrant for electronic equipment seized from FERNANDO ALONZO MAYORGA GALVEZ, NESTOR DIMAANO and DENNIS BALAGTAS pursuant to their arrest on August 23, 2021. All of the following electronic equipment are currently in the possession of a United States Border Patrol agent located in New Hampshire but will be stored at the United States Department of Homeland Security, United States Border Patrol, Beecher Falls Station located at 288 VT -114, Canaan, Vermont 05903 ("Devices"):

     a.     Silver iPhone in a black case in evidence bag A5659634;

     b.     White Google Pixel 2 phone in evidence bag A5659632;

     c.     Pink iPhone in a clear case with flowers in evidence bag A5659735;

     d.     Iridium Satellite Phone in evidence bag L1852978.

5.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were

when the Devices first came into the possession of the United States Department of Homeland Security, United States Border Patrol.

## **PROBABLE CAUSE**

6.      On August 21, 2021, a Border Patrol Agent (BPA) assigned to the Beecher Falls Station was patrolling the U.S./Canada International Border near Halls Stream Road in Pittsburg, New Hampshire. The agent discovered a trail leading to and from the United States into Canada based on fresh shoe prints and a well beaten path coming across the border.  This area is not a recognized entry point into either country.  Near the smuggling trail the agent also discovered an appliance dolly and ratchet straps. Based on tracks of the tires of the dolly it appeared that the dolly was being used to transport contraband across the border and onto Halls Stream Road. The agent took photographs of the dolly but left it in place at that time. BPA and law enforcement partners were made aware of the discovery of the smuggling trail and shown pictures of the dolly.

7.      The location of this smuggling trail is located approximately 2 miles from a July 15, 2021 event where three subjects were seen crossing the border with duffel bags containing approximately 250 lbs. of marijuana. The marijuana what was later seized after a vehicle stop.

8.      On August 23, 2021 at approximately 7:30 p.m.,  New Hampshire Fish and Game Lt. Mark Ober was conducting a patrol of Hall Stream Road and witnessed a dolly matching the description of the dolly discovered on August 21, 2021, leaning up against a camp in close proximity to the suspected smuggling trail. The address of the camp was 3034 Halls Stream Rd., Pittsburg, New Hampshire.

9.      Lt. Ober also witnessed the camp had a "For Sale" sign in front of it and that one of the windows in the back door had been broken to gain entry to the interior door handle. Lt. Ober set up in an area so that he could surveil the camp and radioed Border Patrol Agents for back up. While conducting surveillance and waiting for back-up, Lt. Ober witnessed subjects inside the camp and witnessed one subject leave the camp and then come back. Due to these observations, Lt. Ober suspected that there was a breaking and entering situation occurring at this camp.

10.     At approximately 8:20 p.m., BPA Jeremy Forkey, Matthew Bovay and David Lewis arrived at Lt. Ober's location. The agents approached the camp and ordered any occupants to exit the camp. At this time two subjects exited the house with their hands up. The two men were subsequently identified as FERNANDO MAYORGA-GALVEZ and NESTOR DIMAANO. Agents asked MAYORGA-GALVEZ and DIMAANO if there was anyone else present in the residence. They stated that there was one more subject inside the residence. After further commands for all occupants to exit the camp were unsuccessful, agents entered the camp.

11.     Agents found one subject hiding between a sofa and an air mattress. This subject was subsequently identified as DENNIS BALAGTAS.  He was taken outside with the other men without incident. All three men claimed to be citizens or permanent residents of Canada living in Montreal, Quebec. MAYORGA, BALAGTAS, and DIMAANO were placed under arrest and taken to the Beecher Falls Border Patrol Station for further investigation.

12.     Once all the subjects were in custody, agents started to search the outside perimeter of the property for any outstanding subjects. As agents were searching the area, Agent David Lewis observed a path of beaten down grass leading towards a gap in the trees, Agent

Lewis followed the path to the tree line and observed camouflaged netting covering large black duffle bags. Agent Lewis lifted the corner of the netting and observed three large duffle bags. Agent Lewis left the bags in place and continued to search around the property and found one more large duffle bag approximately 25 feet away in the wooded area near an outhouse. The bags appeared to be the same size, style and type of duffle bags that were used to cover the windows inside the cabin.

13.     Agents requested a canine unit come to the area to assist with a search for any outstanding persons or narcotics. Agent Guthrie Peet and his canine partner Semy arrived on the scene a short time later. Agent Peet and Semy searched the tree line and Semy located and alerted to the presence of narcotics for the three bags in the tree line and the fourth bag located approximately 25 feet away in the wooded area. Following the canine alert, agents recovered the four duffle bags and opened them to reveal multiple vacuum sealed bags of a green leafy substance which later tested positive for approximately 220 pounds of marijuana.

14.     BALAGTAS waived his right to an attorney and agreed to answer questions. He stated that he had worked with DIMAANO and MAYORGA for approximately 1 week and that this was his fifth cross border smuggling run. BALAGTAS stated that he was aware he was crossing the border and could tell by the smell that the bags contained marijuana. BALAGTAS stated that the men would use the dolly to move the duffel bags across the border to the camp. BALAGTAS stated that he had been paid approximately $5,000 so far to smuggle the marijuana. BALAGTAS stated the men would cross the border at approximately 10:30 p.m. and then a vehicle would arrive the next day to pick up the marijuana. During these trips, BALAGTAS observed MAYORCA GALVEZ use the satellite phone to communicate with people.

15.     The Royal Canadian Mounted Police provided the photograph below dated

August 14, 2021 of BALAGTAS AND DIMAANO, dressed in camouflage and black skull caps

walking through the woods directly across from Hall Stream Road on the Canadian side.

DIMAANO is looking at a cell phone in the picture.



16.     Based on my training and experience, I know that those involved in drug

trafficking crimes commonly use cellular telephones as a GPS device to navigate remote terrain

in the border areas.

17.     New Hampshire State Police Troop F identified the owner of the camp at 3034

Halls Stream Road, Pittsburg, NH. Lieutenant Ober contacted the owner to notify him of the

break in at his camp.  Lieutenant Ober asked the owner if he had any clothing or personal items

at his camp.  The owner replied that there shouldn't be anything inside the camp.  Lieutenant

Ober asked if the owner would grant permission for him to enter the camp and retrieve the items

located inside, such as electronic devices.  The owner stated "Sure, no problem.  Do what you

have to do."  Lieutenant Ober informed the owner that New Hampshire State Police were

investigating the break in and had secured photographs of the interior of the camp and the

damage.

18.     At approximately 12:42 a.m. on August 24, 2021, Acting Supervisory Border

Patrol Agent-Intelligence James Loomis contacted the owner who confirmed that he was the

owner of the camp located at 3034 Halls Stream Road, Pittsburg, NH.  The owner was again

informed that there was a break in at his camp and asked if he would grant permission for Border

Patrol Agents to enter the camp and retrieve any items left inside.  The owner granted permission

to enter the camp.

19.     I returned to the camp located at 3034 Halls Stream Road, Pittsburg, NH along

with Border Patrol Agent-Intelligence Thomas Russell and NH Fish & Game Lieutenant Mark

Ober at approximately 1:30 a.m. on August 24, 2021.  Border Patrol Agent Steven Lenhardt

remained at the camp while other Agents returned to the Beecher Falls Border Patrol Station in

order to ensure that nobody entered the camp.  Inside the camp, we located and seized 3 cellular

telephones, one satellite telephone with antenna, a glass methamphetamine pipe, and a pair of

binoculars (cellular telephones and satellite phone described in Attachment A).

20.     FERNANDO ALONZO MAYORGA GALVEZ, NESTOR DIMAANO and

DENNIS BALAGTAS are not citizens of the United States. Based on the observations of agents

and the testimony of BALAGTAS, the subjects entered the United States on Halls Stream Road

in Pittsburg, NH on or about August 22, 2021 at 10:30 p.m. This area is not designated as a Port

of Entry by the Secretary of the Department of Homeland Security.

21.     Based upon all of the above facts, there is probable cause to believe that

beginning on an unknown date but at least by August 14, 2021, through on or about August 23,

2021, in the District of New Hampshire and elsewhere, FERNANDO ALONZO MAYORGA

GALVEZ, NESTOR DIMAANO and DENNIS BALAGTAS knowingly and intentionally

conspired with each other and others to possess with intent to distribute a controlled substance in

violation of Title 21, United States Code, Sections 846 and 841(a)(1) and Illegal Entry in

violation of 8 U.S.C. § 1325.

22.     Based upon my training and experience, I know that drug traffickers commonly

possess and use multiple cellular telephones simultaneously to conduct their drug trafficking

activities.  Evidence of drug crimes can be found in the cell phones and smart phones referenced

in the preceding paragraphs.  Such evidence can include internet searches for drug-related

paraphernalia, addresses, or telephone numbers, as well as incriminating communications via

emails, text messages or instant messages and GPS navigational information.  Actions such as

internet searching or emailing (in addition to calling) and text messaging can now be performed

from many cell phones. I know, based on my training and experience, that drug traffickers may

use these platforms to communicate with people in other countries (often countries from where

drugs are brought into the United States) and with people who are most cautious about law

enforcement detection.

23.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

24.     The Devices are currently in the lawful possession of the United States Department of Homeland Security, United States Border Patrol.  The United States Department of Homeland Security, United States Border Patrol seized the Devices incident to arrest.  Therefore, while the United States Department of Homeland Security, United States Border Patrol might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

**TECHNICAL TERMS**

25.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number,

date, and time of calls made to and from the phone.  In addition to enabling

voice communications, wireless telephones offer a broad range of

capabilities.  These capabilities include: storing names and phone numbers in

electronic "address books;" sending, receiving, and storing text messages and

e-mail; taking, sending, receiving, and storing still photographs and moving

video; storing and playing back audio files; storing dates, appointments, and

other information on personal calendars; and accessing and downloading

information from the Internet.  Wireless telephones may also include global

positioning system ("GPS") technology for determining the location of the

device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or

by connecting the removable storage medium to a separate reader.

Removable storage media include various types of flash memory cards or

miniature hard drives.  Most digital cameras also include a screen for

viewing the stored images.  This storage media can contain any digital data,

including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is

a handheld digital storage device designed primarily to store and play audio,

video, or photographic files.  However, a portable media player can also store

other digital data.  Some portable media players can use removable storage

media.  Removable storage media include various types of flash memory
cards or miniature hard drives.  This removable storage media can also store
any digital data.  Depending on the model, a portable media player may have
the ability to store very large amounts of electronic data and may offer
additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to
display its current location.  It often contains records the locations where it
has been.  Some GPS navigation devices can give a user driving or walking
directions to another location.  These devices can contain records of the
addresses or locations involved in such navigation.  The Global Positioning
System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites
orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each
satellite repeatedly transmits by radio a mathematical representation of the
current time, combined with a special sequence of numbers.  These signals
are sent by radio, using specifications that are publicly available.  A GPS
antenna on Earth can receive those signals.  When a GPS antenna receives
signals from at least four satellites, a computer connected to that antenna can
mathematically calculate the antenna's latitude, longitude, and sometimes
altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device
used for storing data (such as names, addresses, appointments or notes) and
utilizing computer programs.  Some PDAs also function as wireless
communication devices and are used to access the Internet and send and

receive e-mail.  PDAs usually include a memory card or other removable

storage media for storing data and a keyboard and/or touch screen for

entering data.  Removable storage media include various types of flash

memory cards or miniature hard drives.  This removable storage media can

store any digital data.  Most PDAs run computer software, giving them many

of the same capabilities as personal computers.  For example, PDA users can

work with word-processing documents, spreadsheets, and presentations.

PDAs may also include global positioning system ("GPS") technology for

determining the location of the device.

   f.  Internet: The Internet is a global network of computers and other electronic

       devices that communicate with each other.  Due to the structure of the

       Internet, connections between devices on the Internet often cross state and

       international borders, even when the devices communicating with each other

       are in the same state.

26.     Based on my training, experience, and research,  I know that the Devices have

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

GPS navigation device, PDA, and to access the internet.  In my training and experience,

examining data stored on devices of this type can uncover, among other things, evidence that

reveals or suggests who possessed or used the device, evidence of communications between the

users and others, and location information, and other data that may be evidence of conspiracy to

possess with intent to distribute a controlled substance.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

> a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

> b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

> c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

     d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30.    *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

31.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

32.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrants, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation, including by

giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior,

notify confederates, and flee from prosecution.

Signed electronically and sworn to via telephone in accordance with Federal Rule of

Criminal Procedure 4.1 on September 8, 2021.


/s/ James F. Loomis
James F. Loomis, Border Patrol Agent-Intelligence
U.S. Border Patrol
Department of Homeland Security


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.
Crim. P. 4.1 and affirmed under oath the content of this affidavit and complaint.

Date: **Sep 8, 2021**

Time: **12:38 PM, Sep 8, 2021**

Honorable Andrea K. Johnstone
U.S. Magistrate Judge

**ATTACHMENT A**

All of the following electronic equipment are currently in the custody of a United States Border Patrol agent located in New Hampshire but will be stored at the United States Department of Homeland Security, United States Border Patrol, Beecher Falls Station located at 288 VT -114, Canaan, Vermont 05903 ("Devices"):

       a.      Silver iPhone in a black case in evidence bag A5659634;

       b.      White Google Pixel 2 phone in evidence bag A5659632;

       c.      Pink iPhone in a clear case with flowers in evidence bag A5659735;

       d.      Iridium Satellite Phone in evidence bag L1852978.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of 21

U.S.C. § 841(a)(1) and § 846 - Conspiracy to Possess with the Intent to Distribute a Controlled

Substance and 8 U.S.C. § 1325 - Illegal Entry, including:

      a.      any information, including text messages, videos, photographs, internet browser history and application use, related to the possession and/or distribution of controlled substances;

      b.      lists of customers and related identifying information;

      c.      any information related to the conversion of proceeds of illegal drug distribution proceeds into other items of value, like jewelry;

      d.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      e.      any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      f.      any information recording FERNANDO ALONZO MAYORGA GALVEZ, NESTOR DIMAANO and DENNIS BALAGTAS's schedule or travel from July 1, 2021 to the present;

      g.      all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the

things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved

usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.